UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

COLLYN AHRENS AUBREY, *et al.*,

                                    Plaintiffs,

        v.

THE NEW SCHOOL,

                                    Defendant.

No. 21-CV-4915 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances:</u>

Bonnie H. Walker, Esq.
Law Office of Bonnie H. Walker NY
New York, NY
*Counsel for Plaintiffs*

Martin E. Karlinsky, Esq.
Karlinsky LLC
Cornwall-on-Hudson, NY
*Counsel for Plaintiffs*

Jonathan M. Kozak, Esq.
Isaac J. Burker, Esq.
Susan Deegan Friedfel, Esq.
Jackson Lewis P.C.
White Plains, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Collyn Ahrens Aubrey ("Aubrey"), Steven Baboun ("Baboun"), Kaeten J. Bonli

("Bonli"), Jingruo Cheng ("Cheng"), Lydia K. Crouse ("Crouse"), Karen Dias ("Dias"), Caroline

A. Garcia ("C. Garcia"), Tere Garcia ("T. Garcia"), Amanda Johnson ("Johnson"), Javarius

Jones ("Jones"), Tania Khouri ("Khouri"), Josephine Lee ("Lee"), Rae Lavande Pellerin

("Pellerin"), Jessica Saldaña ("Saldaña"), Coraline Jingyan Weng ("Weng"), and Snow Xuecan

Ye ("Ye"; collectively, "Plaintiffs") bring this putative class action against The New School

("Defendant"), alleging that Defendant's transition to online classes amid the Covid-19

pandemic deprived students and parents of students of the educational experience for which they

bargained as students at one of Defendant's colleges, Parsons School of Design ("Parsons"),

giving rise to breach of contract and unjust enrichment claims.  (*See generally* Complaint

("Compl.") (Dkt. No. 2).)  Before the Court is Defendant's Motion to Dismiss (the "Motion").

(*See* Not. of Mot. (Dkt. No. 27).)  For the following reasons, Defendant's Motion is granted.

## I.  Background

### A.  Materials Considered

As a threshold matter, the Court must determine if it may consider a number of exhibits

attached to Defendant's motion papers.  (*See* Aff'n of Jonathan Kozak, Esq. ("Kozak Aff'n")

(Dkt. No. 28).)  The exhibits central to this debate are Parsons' Course Catalog, (Kozak Aff'n

Ex. 1 ("Course Catalog") (Dkt. No. 28-1)), a purported copy of the "Your Right To Know"

webpage on Parsons' website, (Kozak Aff'n Ex. 2 ("Your Right To Know Page") (Dkt. No. 28-

2)), a purported copy of the "2020-2021" webpage on Parsons' website, (Kozak Aff'n Ex. 8

("2020-2021 Page") (Dkt. No. 28-8)), and a purported copy of the "Prior Tuition & Fees"

webpage on Parsons' website, (Kozak Aff'n Ex. 10 ("Prior Tuition & Fees") (Dkt. No. 28-10)).[1]

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the

pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert

the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56."

---

[1] The remaining exhibits include New York State Executive Orders, to which the Court can take judicial notice, *see, e.g., Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*, 544 F. Supp. 3d 405, 412 (S.D.N.Y. 2021) ("[T]he Court can properly take judicial notice of the [New York State] Executive Orders in considering [the] [d]efendant's motion as they are accessible on the State of New York's website[.]"), and materials not germane to the Court's analysis.

*Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). However, "the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety . . . , documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

"Moreover, 'where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.'" *Alvarez v. County of Orange*, 95 F. Supp. 3d 385, 394 (S.D.N.Y. 2015) (alteration omitted) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). As the Second Circuit has reiterated, "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (italics omitted).

The final test for the consideration of extrinsic evidence is the Parties' view on the authenticity thereof. Put simply, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

1.  Website

Plaintiff disputes the accuracy of the webpages—specifically whether said pages were posted and available at the time students, including Plaintiffs, entered into the implied contract with Defendant.  (*See* Pls.' Mem. of Law in Opp. of Mot. ("Pls.' Mem.") 15 n.8 (Dkt. No. 35) ("Without evidentiary support, the Bate declaration [to which Exhibits of Defendant's website was attached] claims this content was added to the website in May 2020.  Of course, when this content was changed, and why, is a matter for discovery.").)  Theoretically, this alone would foreclose the possibility of consideration.  However, Defendants do not rely solely on the Bate declaration for the Court to consider these pages; indeed, in its memorandum of law, Defendant refers to at least one web page—"Your Right to Know" page—using the Wayback Machine internet archive, (*see* Def.'s Mem. of Law in Supp. of Mot. ("Def.'s Mem.") 3 (Dkt. No. 32) (citing *Your Right To Know*, THE NEW SCHOOL,

http://web.archive.org/web/20191214120218/https://www.newschool.edu/about/university-resources/right-to-know/ (last visited Aug. 26, 2022)), and "courts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned under Federal Rule of Evidence 201," *Distributorsoutlet.com, LLC v. Glasstree, Inc.*, No. 11-CV-6079, 2016 WL 3248310, at *2 (E.D.N.Y. June 10, 2016) (collecting cases).

Under Federal Rule of Evidence 201(e), Plaintiffs are entitled to be heard on the propriety of taking judicial notice of the Wayback Machine.  *See* Fed. R. Evid. 201(e).  Plaintiffs have had such an opportunity but failed to even remark on Defendant's reliance thereon.  (*See* Pl.'s Mem. 14–16 (arguing that the Court should not consider information in the declaration while omitting reference to the use of the Wayback Machine).)  Accordingly, the Court agrees

that, irrespective of its consideration of the relevant declaration, the Court may "take judicial notice of this publicly available information" via the Wayback Machine. (*See* Def.'s Reply Mem. Of Law in Supp. Of Mot. ("Def.'s Reply Mem.") 3 n.2 (Dkt. No. 36).) However, because Defendant cites only the "Your Right To Know" page on the archive—and has confirmed the contents of the page remained consistent from December 14, 2019, through April 1, 2020—the Court will only take judicial notice of this page.

## 2. Course Catalog

As stated above, while Plaintiffs dispute the inclusion of the declaration above, and specifically dispute the accuracy of the web pages, (*see* Pl.'s Mem. 14–16 & n.8), Plaintiffs raise no such issue regarding the accuracy of the Course Catalog, (*see generally id.*). Therefore, the Court need only ask whether the Catalog falls into the aforementioned exception, namely consideration via incorporation or integrality.

Because "[a] motion brought under Rule 12(b)(6) challenges only the 'legal feasibility' of a complaint," *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir. 2016) (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)), "[i]n most instances where [the] exception [permitting review of extrinsic documents at this stage] is recognized, the incorporated material is a *contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls*, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint," *Glob. Network Commc'ns*, 458 F.3d at 157 (emphasis added). The Second Circuit has "recognized the applicability of this exception where the documents consisted of emails that were part of a negotiation exchange that the plaintiff identified as the basis for its good faith and fair dealing claim, or consisted of contracts referenced in the complaint which

were essential to the claims." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 107–08

(2d Cir. 2021) (citations omitted) (first citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419,

422 (2d Cir. 2011); and then citing *Chambers*, 282 F.3d at 153 n.4 (2d Cir. 2002)).

      The Court is sympathetic to Plaintiffs' argument that "these principles do not fit well with

a claim for breach of an implied contract." (Pls.' Mem. 16.) However, where New York state

contract law provides for "an implied contract between a student and their college or university,"

*Amable v. The New School* ("*Amable II*"), No. 20-CV-3811, 2022 WL 1443352, at *6 (S.D.N.Y.

May 6, 2022) (quoting *Goldberg v. Pace Univ.*, 535 F. Supp. 3d 180, 193 (S.D.N.Y. 2021)),

"[t]he terms of th[is] implied contract are 'contained in the university's bulletins, circulars[,] and

regulations made available to the student,'" *Papelino v. Albany Coll. of Pharmacy of Union

Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (quoting *Vought v. Teachers Coll., Columbia Univ.*, 511

N.Y.S.2d 880, 881 (App. Div. 1987)); *see also Fedele v. Marist Coll.*, Nos. 20-CV-3559, 20-CV-

3584, 2021 WL 3540432, at *3 (S.D.N.Y. Aug. 10, 2021) (same). In other words, the contract is

comprised of this universe of documents—including the Course Catalog. Plaintiffs concede as

much, stating that the contract "is contained in documents authored, promulgated, and

disseminated by Parsons[,] which describe and define that relationship and set forth certain

promises and representations relating to the education to be afforded" and "include[s] but [is] not

limited to *catalogues* . . . ." (Compl. ¶ 31 (emphasis added); *see also* Pls.' Mem. 6 (noting that

the educational "promises are contained in documents authored, promulgated, and disseminated

by Parsons to students and prospective students[,] which describe and define its relationship with

its students and set forth specific promises and representations relating to the education to be

afforded to its students," including "catalogues, regulations, handbooks, statements included in

manuals, class syllabi, websites, and materials concerning studios and facilities and related

documents").)  Recognizing that, by Plaintiffs' own admission, the Course Catalog is part and parcel to the implied contract, the Court finds that consideration thereof is appropriate as integral to the Complaint without converting the instant Motion into a summary judgment motion.  *See Pincover v. J.P. Morgan Chase Bank, N.A.*, No. 21-CV-3524, 2022 WL 864246, at *5 (S.D.N.Y. Mar. 22, 2022) (considering a deposit agreement as integral to the complaint, which asserted claims for breach of contract that were premised on, inter alia, the deposit agreement's terms).

Moreover, the Court's reasoning is buttressed when considering the alternative.  The Second Circuit has stated that the exception exists specifically to "prevent[] plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting."  *Glob. Network Commc'ns*, 458 F.3d at 157.  As made clear below, were the Court to decline to consider the Course Catalog, such a situation would come to pass.[2]

In sum, the Court will consider at this juncture Parsons' Course Catalog as well as the "Your Right To Know" page on Parsons' website as being integral and being subject to judicial notice, respectively, but it will not consider any additional websites contained in the declarations filed in support of the instant Motion.

B.  Factual Background

The following facts are drawn from Plaintiffs' Complaint and are taken as true for purposes of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F. 4th 91, 94 (2d Cir. 2021) (per curiam).

Defendant is a private university operating principally in New York City.  (Compl. ¶ 20.) Defendant has an endowment greater than $400 million and in 2020 had approximately 10,000

---

[2] Additionally, Defendant does not include any reference to a Wayback Machine archive showing the Course Catalog in its briefing papers.  However, the Course Catalog is also available on the very same "Your Right To Know" page archived on the Wayback Machine and may otherwise be ripe for judicial notice under the same reasoning espoused above.

students enrolled in its programs across its five colleges, one of which is Parsons.  (*See id.* ¶¶ 1, 20.)  At the beginning of the Spring 2020 term, Parsons had roughly 5,000 students enrolled in both undergraduate and graduate level courses, and the cost of tuition for that semester was more than $23,000 per semester.  (*Id.* ¶ 24.)

As an arts school located in New York City, Parsons, Plaintiffs allege, "[p]laces project-based learning at the center of the educational experience."  (*Id.* ¶ 29.)  The school "takes full advantage of [its] . . . location and connectivity to global urban centers" by integrating its curriculum "in the design and arts industries centered in New York City," which "adds to its prestige and to the value of the education it offers."  (*Id.* ¶¶ 29, 25).  According to Plaintiffs, the goal of the curriculum is "to produce graduates who are prepared to enter the various fields and careers to which training in design leads."  (*Id.* ¶ 25.)  Additionally, graduate students at Parsons work on a thesis "that is the centerpiece of Parsons education," (*id.* ¶ 46), wherein they create a final work product in their specified field that, along with the rigorous curriculum, "often is a springboard for careers in design, art, fashion, photography, architecture, and other fields," (*id.* ¶ 25).

Parsons represents that its students benefit from the experience, networks, and tutelage of "world-renowned artists, scholars, and practitioners who lead their industries and academic fields." (*Id.* ¶ 26.)  The result, Plaintiffs aver, "is one of the leading schools of design in the United States."  (*Id.* ¶ 23.)

Plaintiffs are former Masters of Fine Arts ("MFA") candidates at Parsons who were set to graduate in either 2020 or 2021.  (*Id.* ¶¶ 1, 4–19.)  In early 2020, Plaintiffs began the Spring 2020 normally, but by March 2020, the Covid-19 pandemic had spread throughout the United States to the extent that essentially all universities and colleges in the United States went into

lockdown.  (*Id.* ¶ 44.)  On March 26, 2020, Defendant suspended in-person learning, moved its instruction online to Zoom and like platforms, and "announced the temporary closure of its facilities for an indeterminate amount of time."  (*Id.* ¶ 45.)

Plaintiffs allege dramatic negative impacts on their in-person projects and education, including their thesis work.  (*See generally* ¶¶ 46–55.)  Specifically, Plaintiffs claim they were denied access to various studios, storages spaces, shops, labs, and facilities that prevented them from continuing their work.  (*See id.* ¶ 46.)  These facilities are specialized to students' various fields and based around what Parsons calls the "Making Center," a network of 34 studios including, but not limited to, collaborative spaces and resources for 3D printing, ceramics, and photography.  (*See id.* ¶¶ 40–42.)  Plaintiffs also describe these facilities as "essential to the education Parsons made available to its students."  (*Id.* ¶ 43.)  For the same reason, Plaintiffs claim work done on theses work was negatively impacted as a result of the shift to online instruction.  (*See id.* ¶¶ 48–52.)  Plaintiffs allege that "Parsons students typically rely on producing a professional portfolio as a means of securing future opportunities and employment," meaning that the shift to online classes and correspondent inability to complete work in person would have a negative impact on students' employment opportunities.  (*Id.* ¶ 49; *see also id.* ¶ 48.)  As a result, Plaintiffs allege they "have incurred substantial damages, in the form of payment of tuition and in other forms, by reason of Parsons' delay."  (*Id*. ¶ 52.)

According to Plaintiffs, the transition to online instruction violated their implied contractual agreement with Defendant.  (*See id.* ¶ 30.)  Plaintiffs concede that while no formal, written contract exists between the Parties, "an enforceable contract . . . may be implied from the specific written promises made by Parsons to its students and from the presumed intention of the [P]arties as indicated by their conduct."  (*Id.*)  Plaintiffs point to various documents authored and

disseminated by Defendant describing the Parties' contractual intent, including "but [] not limited to catalogues, regulations, handbooks, statements included in manuals, class syllabi, and materials concerning studios and facilities and related documents." (*Id.* ¶ 31.)  Plaintiffs maintain that while online learning may effectively replace in-person learning for other disciplines, "[t]his is not the case with art and design." (*Id.* ¶ 47.)  Yet, they also claim they do not complain of the quality of education Parsons provided, "only of the fact that the education Parsons promised them was not what Parsons provided." (*Id.* ¶ 53.)

Plaintiffs purport to bring this action both "individually and on behalf of a class consisting of themselves and all other students who were enrolled in Parsons for all periods during which the specific promises regarding their education made to them by [Defendant] were not fulfilled and therefore breached." (*Id.* ¶ 21.)  Thus far, Plaintiffs have not—and do not here—seek an order certifying a class under Rule 23 of the Federal Rules of Civil Procedure. (*See generally* Dkt.)

C.  Procedural History

Plaintiffs filed their Complaint on June 3, 2021, (*see* Compl.), which was initially assigned to Judge Failla the next day, (*see* Dkt. (initial assignment notice for June 9, 2021)).  On August 9, 2021, Defendant filed a pre-motion letter seeking leave to file a motion to dismiss and either to consolidate this matter with *Amable v. The New School*, No. 20-CV-3811 (S.D.N.Y.), pursuant to Fed. R. Civ. P. 42(a) or to transfer the matter to this Court pursuant to Rule 13(a)(1) of the S.D.N.Y. Rules for the Division of Business Among District Judges as related to *Amable*. (*See* Dkt. No. 16.)  Plaintiffs responded to this letter three days later, arguing that consolidation is "premature" and disputing Defendant's arguments regarding dismissal.  (*See* Dkt. No. 17.)  On August 30, 2021, Judge Failla ordered this matter to be transferred to this Court as related to *Amable*.  (Dkt. No. 19.)

Defendant timely filed the instant Motion and supporting papers on November 18, 2021. (*See* Not. of Mot.; Kozak Aff'n; Decl. of Rebecca Hunter ("Hunter Decl.") (Dkt. No. 29); Decl. of Rachel Schreiber ("Schreiber Decl.") (Dkt. No. 30); Decl. of Christopher Bate ("Bate Decl.") (Dkt. No. 31); Def.'s Mem.)  Plaintiffs filed their Opposition on December 20, 2021.  (*See* Pls.' Mem.)  On January 19, 2022, Defendant filed its Reply.  (*See* Def.'s Reply Mem.)  On April 3, 2022, Plaintiffs provided notice of supplemental authority in opposition to the instant Motion. (*See* Letter from Plaintiffs to Court (Apr. 3, 2022) ("Pls.' Supp. Authority Letter") (Dkt. No. 37).)  Finally, on April 6, 2022, Defendants responded to Plaintiffs' proffer of supplemental authority and offered additional authority in support of its Motion.  (Letter from Defendants to Court (Apr. 6, 2022) ("Def.'s Supp. Authority Letter") (Dkt. No. 38).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege

"only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if

a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[]

complaint must be dismissed."  *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.  But where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second

alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8

marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior

era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions.").

     "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per

curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot.

Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*,

699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a

district court must confine its consideration to facts stated on the face of the complaint, in

documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d

99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d

306, 317 (S.D.N.Y. 2016) (same).

     <u>B.  Analysis</u>

     Plaintiffs bring the following three claims: (1) breach of contract concerning restitution,

(2) breach of contract concerning damages, and (3) unjust enrichment.  (*See* Compl. ¶¶ 56–72.)

Defendant argues that Plaintiffs have failed to satisfy their pleading standards with regard to each claim.  (*See generally* Def.'s Mem.; Def.'s Reply.)  The Court reviews the sufficiency of each claim in turn.

### 1.  Breach of Contract

Defendant groups Plaintiffs' two breach of contract claims together and argues that both must be dismissed for failure to state a claim as having failed to plead the existence of articulable and enforceable promises or breaches thereof.  (*See* Def.'s Mem. 7–17; Def.'s Reply 3–8.)  Defendant argues in the alternative that Plaintiffs' breach of contract claims must be dismissed as having failed to suffer cognizable damages, pursuant to the doctrine of impossibility, and/or under the doctrine of acceptance.  (*See* Defs.' Mem. 17–21; Def.'s Reply 8–10.)  The Court reviews Defendant's arguments to the extent necessary.

### a.  Applicable Law

"In a breach of contract case, a plaintiff must plead '(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach.'"  *Thales Alenia Space France v. Thermo Funding Co., LLC*, 959 F. Supp. 2d 459, 464 (S.D.N.Y. 2013) (quoting *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011)).

"Under New York law, there exists an implied contract between a student and their college or university."  *Amable II*, 2022 WL 1443352, at *6 (quoting *Goldberg*, 535 F. Supp. 3d at 193); *see also Papelino*, 633 F.3d at 93 ("Under New York law, an implied contract is formed when a university accepts a student for enrollment . . . .").  "The essence of the implied contract is that an academic institution must act in good faith in its dealings with its students."  *Olsson v.*

*Bd. of Higher Educ.*, 402 N.E.2d 1150, 1153 (N.Y. 1980); *see also Amable II*, 2022 WL 1443352, at *6 (same); *Goldberg*, 535 F. Supp. 3d at 193 (same). "The terms of th[is] implied contract are contained in the university's bulletins, circulars[,] and regulations made available to the student." *Papelino*, 633 F.3d at 93 (citation and quotations marks omitted); *see also Fedele*, 2021 WL 3540432, at *3 (identifying the same facets of an implied contract with an education institution, namely the bulletins, circulars, and regulations (citing *Vought*, 511 N.Y.S.2d at 881). "Thus, 'to make out an implied contract claim' against a university, 'a student must identify specific language in the school's bulletins, circulars, catalogues and handbooks which establishes the particular 'contractual' right or obligation alleged by the student.'" *In re Columbia Tuition Refund Action* ("*Columbia*"), 523 F. Supp. 3d 414, 421 (S.D.N.Y. 2021) (quoting *Keefe v. New York L. Sch.*, 906 N.Y.S.2d 773, 2009 WL 3858679, at *1 (N.Y. Sup. Ct. 2009), *aff'd*, 897 N.Y.S.2d 94 (App. Div. 2010)). Interpreting such purported promises, "like the interpretation of any contract, is a matter of law for the [c]ourt." *Id.* (quoting *Deen v. New Sch. Univ.*, No. 05-CV-7174, 2007 WL 1032295, at *2 (S.D.N.Y. Mar. 27, 2007)). The existence of a promises is premised on "a provision that guarantees 'certain *specified* services,'" *id.* (emphasis added) (quoting *Baldridge v. State*, 740 N.Y.S.2d 723, 725 (App. Div. 2002)), as opposed to a "general statement of policy," *id.* (brackets omitted) (quoting *Keefe*, 2009 WL 3858679, at *1), "or to statements of 'opinion or puffery,'" *id.* (quoting *Bader v. Siegel*, 657 N.Y.S.2d 28, 29 (App. Div. 1997)). The importance of this classification—promise or puffery—to the Court's analysis of Plaintiffs' claims and Defendant's arguments compels a more detailed explanation of the framework.

Generally speaking, a promise that lacks objective measurements or definitive language by which to objectively analyze performance is deemed unenforceable "puffery." A few

examples are telling.  In *Bader*, the Appellate Division held that, upon enrolling in the "defendant's self-improvement lifestyle course," a "promise to demonstrate the 'strategies, tactics, and formulations'" to learn how to have more open and effective conversations was "too vague to be enforced as a contract, and to the extent such a representation was made, it was in the nature of opinion or puffery incapable of being proved true or false."  657 N.Y.S.2d at 29 (citing *Paladino v. Adelphi Univ.*, 454 N.Y.S.2d 869, 873 (App. Div. 1982)).  And in this Court's decision in *Amable v. New School*, a "Promotional Statement" by the university defendant that discusses the "main campus in New York City" as well as the "Parsons Paris campus" was "a classic example of 'mere opinion or puffery that is too vague to be enforced as a contract," because it served strictly to "market" the "on-campus experience as a benefit of enrollment." 551 F. Supp. 3d 299, 313 (S.D.N.Y. 2021) ("*Amable I*") (quoting *Columbia*, 523 F. Supp. 3d at 423).  So, too, have courts rejected the following generalized "promises" as too vague to be enforced: "i) to provide a great learning environment for adult students; ii) to respect adult students and treat them with respect; iii) to not discriminate against adult students; iv) to provide supervision and teaching by honest and unbiased instructors; and v) to provide and to follow guidelines for student treatment," *Ward v. N.Y. Univ.*, No. 99-CV-8733, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000), or "a) to provide [the] plaintiff with an educational environment free of sex discrimination in all programs and activities, including academic programs and school-sponsored activities on and off campus; b) to provide [the] plaintiff with an educational environment free of sexual harassment; [and c)] not to retaliate against anyone who participated in the process of reporting or attempting to remedy sexual harassment or discrimination," *Novio v. N.Y. Acad. of Art*, 317 F. Supp. 3d 803, 812 (S.D.N.Y. 2018).

By contrast, the hallmarks of enforceable promises are far more specific and concrete.  In one example, a court in this district upheld a promise that an educational course would hold "program activities from 9:00 A.M. to 4:00 P.M. every day" as well as confer "membership" in a specific (and laudable) professional organization.  *Ansari v. N.Y. Univ.*, No. 96-CV-5280, 1997 WL 257473, at *3 (S.D.N.Y. May 16, 1997).  In a case analogous to this Action, the *Columbia* court concluded that Pace University's promise to hold classes "on-campus" was sufficiently specific and enforceable as a promise to teach classes in-person, because the university elsewhere stated that courses held "'[o]n-campus' would be 'taught with *only* traditional in-person, on campus class meetings.'"  523 F. Supp. 3d. at 424 (emphasis in original).

Importantly, these principles apply irrespective of the form of education at issue, including fields that some may consider more hands-on.  In *Goldberg v. Pace University*, for example, it was immaterial that the plaintiff was enrolled in Pace University's MFA graduate program, as the plaintiff had identified various representations that "almost certainly envision[ed] the familiar norm of in-person instruction" but "d[id] not contain or constitute a specific promise of such" in-person instruction.  535 F. Supp. 3d. at 194; *see also id.* at 194–95.  Conversely, in *Brittain v. Trs. of Columbia Univ.*, graduate students at Columbia University's Graduate School of the Arts pursuing MFAs in visual art, sound art, or film brought similar claims to those in this Action, and the court found a specific, enforceable promise where the university had signed leases with students for studio space that provided "studios may be accessed 24 hours per day seven days per week [including breaks]" without an "express term permitting Columbia to revoke a student's right of access under any circumstances."  No. 20-CV-9194, 2021 WL 3539664, at *5–6 (S.D.N.Y. Aug. 11, 2021).  In other words, the abstractness or hands-on nature of a field of study—an approximation for the degree to which the

course may be more suitable to online learning—does not bear on the analysis as to whether there exists an enforceable promise of in-person educational instruction.[3]

### b.  Statements Alleged to Constitute Promises

Having articulated the framework for what constitutes an enforceable promise versus what constitutes unenforceable puffery, the Court now turns to the specific allegations in Plaintiffs' Complaint regarding from whence they divine Defendant's promises.  For the ease of understanding, the Court slightly rearranges the purported promises into three broad categories: (1) representations on Defendant's website regarding school's mission and educational approach, to which the Court refers as "value statements," (*see* Compl. ¶¶ 26–29); (2) specific representations made on Defendant's website regarding features of the art and design education,

---

[3] Two decisions on which Plaintiffs rely, (*see* Pls.' Mem. 11–13), seemingly undermine this framework.  In *Flatscher v. Manhattan School of Music*, the plaintiff was a vocalist student who enrolled in a Bachelor of Music degree program and brought analogous claims to those in this Action against the "premier international conservatory" following its switch to online learning.  551 F. Supp. 3d 273, 276–77 (S.D.N.Y. July 20, 2021).  The *Flatscher* court found that the plaintiff "identified sufficiently specific statements" to merit an enforceable promise, such as "guarantees students that its practice rooms will be open for 24 hours each day," *id.* at 277, as well as the requirement of "'hands-on' instruction in [the defendant's] facilities and 'in-person' performance," *id.* at 278.  The *Flatscher* court, though, highlighted the "school's unique status as a musical conservatory," *id.* at 285, and pointed to out-of-district cases that similarly considered the nature of the program, *see id.* at 285–86.  However, the Court considers this pronouncement dicta, having already found the existence of enforceable promises, *see id.* at 277–78, and does interpret it as in potential conflict with the aforementioned framework New York State contract law has fashioned.

The same is true with *Brittain*.  Because the *Brittain* court identified specific promises regarding the studio leases as well as the specific statements that students "*will* have one studio visit each week" as giving rise to a promise of in-person instruction, 2021 WL 3539664, at *5– *6 (emphasis in original) (quotation marks omitted), any further discussion of the field of study is similarly superfluous.

Finally, Plaintiffs' citation to case law from outside New York and the Second Circuit also does not bear on this question, as any such case "is not controlling of the issues before this Court" insofar as it does not concern New York State contract law.  (Pls.' Supp. Authority Letter 1–2.)

(*see id.* ¶¶ 32–36, 39–42); and (3) representations specifically made in the Fine Arts Handbook, (*see id.* ¶¶ 37–38).

### i.  Mission And Value Statements

Per Plaintiffs, Parsons (and thus Defendant) has pronounced several value statements, including the school's official mission statement as well as its educational approach.  (Pls.' Mem. 6–7.)  For example, Plaintiff states that Parsons' faculty "comprises world-renowned artists, scholars, and practitioners who lead their industries and academic fields," while the school's structure enables students to "work closely with them, benefitting from their scholarship and professional experience and networks."  (Compl. ¶ 26.)  Further, Plaintiffs allege that Parsons' website reads: "Our small class sizes enable you to benefit from their real-world experience and industry access."  (*Id.*)  Parsons allegedly made similar representations about its mission, claiming: "[our] diverse community of students and faculty explore multiple sites and scales of engagement, from on-campus research initiatives to partnerships that bring about change in New York and . . . the world."  (*Id.* ¶ 27.)  So, too, did Parsons proclaim the following about its vision for the future: "Parsons' future will be shaped by the core values that have defined our past: curricular innovation, collaborative methods, pioneering uses of technology, and experimentation."  (*Id.* ¶ 28.)  Finally, Plaintiffs allege that Parsons espouses the following educational approach, per its website: "We will fulfill our mission by extending The New School's legacy as a nontraditional academic community, nimble and responsive to change that . . . [p]laces project-based learning at the center of the educational experience[,] [and t]akes full advantage of our New York City location and connectivity to global urban centers."  (*Id.* ¶ 29.)

As made clear above, value statements (including mission statements) are no different than other potentially enforceable representations; whether they are enforceable is determined by the specificity of the statement itself.  For example, in *Espejo v. Cornell Univ.*, 523 F. Supp. 3d 228 (N.D.N.Y. 2021), the district court reviewed Cornell University's mission statement, which reads: "Cornell's mission is to discover, preserve, and disseminate knowledge; produce creative work; and promote a culture of broad inquiry throughout and beyond the Cornell community . . . . Within the context of great diversity, a Cornell education comprises formal and informal learning experiences in the classroom, on campus, and beyond." *Id.* at 239, *on reconsideration sub nom. Faber v. Cornell Univ.*, No. 20-CV-467, 2021 WL 4950287 (N.D.N.Y. Oct. 25, 2021). On reconsideration, the *Faber* court found that because the mission statement specifically names "experiences in the classroom" and "on campus" to be only a portion of "what comprises a Cornell education," "[t]he only enforceable promise is that a Cornell education *would include* in-person instruction," not that the education would be *exclusively* in person.  *Faber*, 2021 WL 4950287, at *3 (emphasis added).  To emphasize this point, the *Faber* court compared this to the *Columbia* court's reliance on the fact that Pace University's course roster specifically stated that classes would "only" occur in person.  *Id.* (citing *Columbia*, 523 F. Supp. 3d at 424).

In contrast to Cornell's mission statement, Parsons' value statements, including its mission statement, do not include specific language that would give rise to a promise of exclusively in-person education.  These statements only affirmatively discuss on-campus activities in the form of "research initiatives," not classroom education.  (Compl. ¶ 27.)  In fact, there is no reference to, let alone a promise of, in-person education in its "vision" or "educational approach."  (*Id.* ¶¶ 28, 29.)  To the contrary, these two statements seemingly intimate a possibility of remote or online education, speaking of "pioneering uses of technology[] and

experimentation," "a desire to challenge the status quo . . . in . . . how we teach," and a "nontraditional academic community." (*Id.* ¶¶ 28, 29.) Plaintiffs also allege that Parsons' "educational approach" includes "[t]ak[ing] full advantage of our New York City location," but even this statement places its location in the context of its "connectivity to global urban centers," (*id.* ¶ 29), rather than a commitment that such education must take place at the school's New York location.

In sum, the value statements Parsons allegedly made on its website are vague and lack any determinative or promissory language that demands in-person instruction; accordingly, these statements do not give rise to any articulable promise, let alone one of exclusively in-person education. *See Goldberg*, 535 F. Supp. 3d at 186, 193–94 (holding that representations about training side-by-side with industry professionals, access to black-box studios, and faculty-student collaboration spaces did "not anywhere state that this collaboration *must* occur in person" (emphasis added)); *Faber*, 2021 WL 4950287, at *3 (finding that Cornell University's mission statement lacks definitive language promising exclusively in-person instruction).

Additionally, to the extent Plaintiffs would have the Court rely on Parsons' determinative, future-focused language that it "will be shaped by the core values" or "will fulfill [its] mission," (Compl. ¶¶ 28, 29), the representations are too vague to constitute enforceable promises in that they lack concrete, specific, or measurable indicia of compliance. *See Novio*, 317 F. Supp. 3d at 812–13 (S.D.N.Y. 2018) (holding that a promise to, inter alia, provide plaintiff with an educational environment "free of sexual harassment" was too vague to be an enforceable promise); *Ward*, 2000 WL 1448641, at *4 (holding that promises to, inter alia, "provide a great learning environment" was too vague to constitute an enforceable promise,

20

notwithstanding a specific promise to do so).  Therefore, Parsons' value statements do not give rise to a promise of in-person instruction.

### ii.  Specific Representations on Defendant's Website

Plaintiffs next point to statements Defendant made on its website regarding "the importance of their studios and of other campus-based facilities," (Pl.'s Mem. 13), which buttress the core value of in-person education as giving rise to a promise thereof.  Specifically, Plaintiffs allege that Defendants held out the following on Parsons' website: that "[t]he studio is your space to make work," (Compl. ¶ 32); that the educational format will be "'full time, on-campus' for a 'duration' of two years," (*id.* ¶ 33); that the education will include a "'clean, newly painted studio' at the outset of each term," (*id.* ¶ 34); that studios to be provided to students "would enable them to 'develop diverse studio practices," (*id.* ¶¶ 35–36); and, that students will have access to various on campus facilities like the "Making Center," (*id.* ¶ 40), thirty-four separate labs, shops, and studios, (*see id.* ¶¶ 40–42).  One of these representations plausibly alleges an enforceable promise of in-person educational instruction; the rest do not.  Specifically, that Parsons stated on its website that the MFA program would be "'full time, on-campus' for a 'duration' of two years," (*id.* ¶ 33), plausibly alleges a promise of in-person education.  To explain its reasoning, the Court begins with the text of the statement alleged and then turns to applicable precedent.

Most portions of this specific statement are clear and definite: "full time" and "two years" are beyond ambiguity.  Concededly, whether something occurs "on campus" is slightly trickier.  Indeed, if an instruction takes place "on-campus," is that where the instruction is given, received,

both, or even neither?[4]  This question must also be set against the important backdrop that

education, especially at the collegiate and graduate level, is traditionally in-person.  *Cf. Erie*

*Cnty. Bd. of Soc. Welfare on Complaint of McCarter v. Holiday*, 220 N.Y.S.2d 679, 680 (App.

Div. 1961) (stating that courts may "take judicial notice of the normal things of life").[5]  In other

words, the Court recognizes that saying the program "would be 'on-campus,'" (Compl. ¶ 33), in

the context of a traditional educational instruction, could be understood as giving rise to a

promise of in-person education.  "At best, it is ambiguous and, '[o]n a motion to dismiss a breach

of contract claim,' the Court must 'resolve any contractual ambiguities in favor of the plaintiff.'"

*Columbia*, 523 F. Supp. 3d at 425 (quoting *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für*

*Chemische Industrie*, 784 F.3d 78, 86 (2d Cir. 2015)).  Therefore, the Court concludes that, at

this stage, Plaintiffs have plausibly alleged an enforceable promise for in-person education via

Defendant's statements regarding the nature of the degree program.

The remaining statements regarding a student's education to which Plaintiffs point do not

similarly give rise to such a promise.  In broad strokes, these statements "market" the "on-

campus experience as a benefit of enrollment," *Amable I*, 551 F. Supp. 3d at 313 (quoting

*Columbia*, 523 F. Supp. 3d at 423), and Plaintiffs' reliance on "the kind of hands-on, studio- and

---

[4] Taking this question one step further, consider the following: if a professor taped a lecture while in a Parsons classroom and disseminated it globally where students watched without the Parsons campus, did the lecture take place "on-campus"?  Conversely, if students watched an online class from the comfort of Parsons' dormitories, did the lecture meet this criterion, or must both the instructor and the student be together and on the university's campus to satisfy this requirement? Adding even more uncertainty, if an instructor were to hold a class in person in the heart of New York City and all students "attended," i.e. stood next to the professor, but the group never once step foot in a classroom, does the class meet the "on-campus" criterion?

[5] *See also Chaney v. Starbucks Corp.*, 115 F. Supp. 3d 380, 388 & n.7 (S.D.N.Y. 2015) (listing the wide-ranging "phenomen[a]" of which courts in this district have taken judicial notice, ranging from the fact that modern forms of entertainment commonly depict unethical characters to Facebook's popularity to New York's population to clothing styles).

facilities-based training at issue in this case," (Pls.' Mem. 14), is immaterial.  *See supra* II.A.1.a

& n.3.  For example, Parsons alleged stated that "[t]he studio is your space to make work,"

(Compl. ¶ 32), or that in-person facilities "'enable[es] [sic] students to bring new materials

techniques, and partners into their making practices,'" (*id.* ¶ 40) (alteration in original), or that

Parsons' MFA program was interdisciplinary, (*id.* ¶¶ 35–36).  These statements, "although

tacitly presupposing and almost certainly envisioning the familiar norm of in-person instruction,

do not contain or constitute a specific *promise* of such."  *Goldberg*, 535 F. Supp. 3d at 194

(emphasis added).  The same is true regarding Parsons promise to "provide students with a

'clean, newly painted studio' at the outset of each term."  (Compl. ¶ 34.)  While this makes a

clear and articulable promise regarding a studio generally, it does not state that students *must*

enter the studio at any given time, as was the case in *Flatscher*.  *See* 551 F. Supp. 3d at 284

(holding that a university's demand for in-person attendance as part of a given program gave rise

to a promise of in-person education).[6]  In sum, based on Defendant's statements on its website,

Plaintiffs adequately allege a promise of in-person educational instruction solely via the

statement that the MFA program is "'full time, on-campus' for a 'duration' of two years."

(Compl. ¶ 33.)  *See Columbia*, 523 F. Supp. 3d at 424–25 (concluding that the plaintiff plausible

alleged that Pace University breached a promise when it moved classes online having promised

---

[6] The Court recognizes that with this particular statement adequately alleges a second
enforceable promise beyond the promise of in-person education: that Parsons would "provide
students with a 'clean, newly painted studio' at the outset of each term."  (Compl. ¶ 34.)  Simply,
this similarly contains enough definite language and specificity pointing toward tangible
benchmarks to sustain a breach of promise claim.  Ultimately, this second specific promise is
moot; nowhere in their Complaint do Plaintiffs also allege that they were not provided with this
new studio space at the beginning of the semester.  (*See generally id.*)  Accordingly, Plaintiffs do
not adequately allege a breach of contract with respect to the studio space.

that classes would take place "on-campus" and defining "on-campus" to specifically mean "only traditional, in-person" learning).

### iii.  Fine Arts Handbook

Finally, Plaintiffs contend that Parsons' Fine Arts Handbook gives rise to a promise of in-person instruction.  Plaintiffs allege that "[t]he central facility for learning at Parsons is the studio and similar facilities," even placing the "Fine Arts Studio" at the top of its "Fine Arts handbook." (Compl. ¶ 37.)  To that end, Plaintiffs state, "Parsons reinforces the centrality of studio resources by making clear that full time faculty members will be available for consultation and advising its students to '[s]imply send the faculty member an email to request a studio visit when needed,'" (*id.* ¶ 38 (alteration in original)), and "community etiquette" makes clear "that "[a]ll students using studios are part of a community which they should respect and support," and urges students to "actively contribute to events happening within the studios such as Open Studios and Final Show," (*id.* ¶ 39 (alteration in original)).  Each of these statements, once again, "tacitly presuppos[e] and almost certainly envision[] the familiar norm of in-person instruction, [but] do not contain or constitute a specific promise of such."  *Goldberg*, 535 F. Supp. 3d at 194.

For example, with respect to Plaintiffs' allegation that faculty members "will be available for consultation," (Compl. ¶ 38), the alleged statements do "not imply a contractual entitlement" for such consultations to occur in a specific "location and manner."  *Columbia*, 535 F. Supp. 3d at 423.  Moreover, they do not state that such visits are mandatory, as would give rise to such a promise of in-person instruction.  *Cf. Flatscher*, 551 F. Supp. 3d at 284 (holding that a university's demand for in-person attendance as part of a given program gave rise to a promise of in-person education).  Plaintiffs tacitly concede as much, as the Complaint states that students may only "*request* a studio visit when needed," (Compl. ¶ 38), not that such meetings will

24

automatically occur.  In another example, Parsons' alleged statements regarding "community

etiquette" and its urging of students to contribute to the community, (*id.* ¶ 39), suffer from an

analogous infirmity.  Again, these allegations "do[] not anywhere state that this [contribution]

*must* occur in person."  *Goldberg*, 535 F. Supp. 3d at 194 (emphasis added).

Lacking specificity or definite language regarding the mandatory nature of in-person

activities or classes, Plaintiffs' allegations regarding the Fine Arts Handbook do not give rise to

an implied promise of in-person education.

### c.  Disclaimers

It is on Defendant's disclaimer that Plaintiffs' breach of contract claims falter.  More

precisely, given Parsons' far-reaching and all-encompassing disclaimers that encompasses a

modification to Parsons' program, the Court holds that any promise identified therefrom must

give way.

A "'specific disclaimer[]' . . . may excuse the university from a specific promise that

would otherwise be a contractual obligation."  *Deen*, 2007 WL 1032295, at *2 (quoting *Prusack

v. State*, 498 N.Y.S.2d 455, 456 (App. Div. 1986)).  To that end, district courts in the Second

Circuit have previously analyzed whether disclaimers in various university materials can excuse

schools from promises to which they would otherwise be beholden, including holding that such

disclaimers compelled dismissal of breach of contract claims when said promises—even if found

to exist—were breached.

In *Columbia*, relying on the above-quoted language from *Deen*, the court examined the

breadth of Pace University's disclaimer.  523 F. Supp. 3d at 424–25.  Pace University's

disclaimer provided that "unforeseen circumstances may necessitate adjustment to class

schedules . . . [t]he University shall not be responsible for the refund of any tuition or fees in the

event of such occurrence . . . . Nor shall the University be liable for any consequential damages as a result of such a change in schedule."  *Id.* at 424.  The *Columbia* court held that the disclaimer "arguably does not cover the change in instructional format from in-person to online." *Id.* at 425.  The same was true in *Bergeron v. Rochester Inst. of Tech.*, where a disclaimer saying "[the university] reserves the right to alter any of its courses at any time" was deemed "not broad enough to extinguish Plaintiffs' claims."  No. 20-CV-6283, 2020 WL 7486682, at *7 (W.D.N.Y. Dec. 18, 2020).  By contrast, in *Romankow v. New York Univ.*, No. 20-CV-4616, 2021 WL 1565616 (S.D.N.Y. Apr. 21, 2021), another court in this district held that New York University's "broad" disclaimer made it "clear that [it] expressly reserved the right to change, relocate, and/or modify its course offerings," *id.* at *4.

The disclaimers at issue in this Action fall into the latter category.  The "Your Right To Know" page—of which the Court can take judicial notice, *see* I.A.1, and which comprises part of the implied contract, (*see* Pls.' Mem. 6–7 (including "websites" "authored, promulgated, and disseminated by Parsons" as comprising the implied contract))—contains the following reservation of rights:

> The information included in the catalogs and all materials of [Defendant] represents the plans of [Defendant] at the time they are made public.  [Defendant] reserves the right to change without notice any content in its print or online materials, including but not limited to tuition, fees, policies, degree programs, names of programs, course offerings, academic activities, academic requirements, facilities, faculty and administrators.  Payment of tuition and attendance of classes constitute acceptance of university policies set forth on this page and in the catalogs and other pages linked from it.

(Def.'s Mem. 3.)  Parsons' Academic Catalog also contains the following disclaimer:

> Important Notice: The information published herein represents the plans of The New School at the time of publication.  The university reserves the right to change without notice any matter contained in this publication, including but not limited to tuition, fees, policies, degree programs, names of programs, course offerings, academic activities, academic requirements, facilities, faculty, and administrators.

Payment of tuition for or attendance in any classes shall constitute a student's acceptance of the administration's rights as set forth in this notice.

(Kozak Aff'n Ex. 1, at 3; *see also 2019-2020 Catalog*, THE NEW SCHOOL,

http://web.archive.org/web/20191026164517/https://www.newschool.edu/academic-catalog.pdf

(last visited Aug. 26, 2022).)  In light of these disclaimers, Defendant argues, any promises created "are legally deficient."  (Def.'s Mem. 2–3.)

Defendant is correct.  The disclaimer expressly contemplates changing the "degree programs," (*see id.* at 3), language about which gave rise to the promise of in-person education, *see supra* I.B.1.ii.  Crucially, Defendant also reserved the right to make such changes "without notice."  (Def.'s Mem. 3.)  Therefore, "[g]iven the broad scope of this disclaimer it is clear that [Defendant] expressly reserved the right to change, relocate, and/or modify its course offerings." *Romankow*, 2021 WL 1565616, at *4.[7]

The Court is not alone in its finding; rather, applying New York law, "[o]ther courts in this Circuit have found that disclaimers in course catalogs with a similarly 'broad scope' mean that 'plaintiffs cannot plausibly allege that [the defendant] breached its contract in violation of the catalog's statement that certain classes would be held in person.'"  *Moore v. Long Island Univ.*, No. 20-CV-3843, 2022 WL 203988, at *5 (E.D.N.Y. Jan. 24, 2022) (quoting *Hewitt v. Pratt Inst.*, No. 20-CV-2007, 2021 WL 2779286, at *3 (E.D.N.Y. July 2, 2021)); *see also Freeman v. N.Y. Univ.*, No. 21-CV-1029, 2022 WL 445778, at *2 (S.D.N.Y. Feb. 14, 2022) (dismissing claims against a defendant university where it "expressively reserved the right to modify 'course offerings, schedules, [and] activities,' including the 'elimination,' 'cancellation,'

---

[7] To the extent Plaintiffs would argue that the web page's disclaimer only reserves the right to change the information *advertised* as compared to reserving the right to change the actual substance of the underlying information, (Def.'s Mem. 3), the Course Catalog specifically reserves the right to change the "matter," not simply the information advertised thereabout, (Kozak Aff'n Ex. 1, at 3).

27

'relocation,' or 'modification' of academic activities or programs").[8]  Accordingly, the Court

holds that Defendant's disclaimer "absolve[s] [Defendant] from liability under a breach of

contract theory specific to in-person instruction."  *Amable II*, 2022 WL 1443352, at *9.  Thus,

Defendant's Motion with respect to Plaintiffs' breach of contract claims is granted, and such

claims are dismissed.[9]

---

[8] While not binding insofar as they are applying non-New York state contract law, it is
worth noting that federal courts outside New York have reached analogous conclusions in
parallel actions concerning a switch in education from in-person to online learning as a result of
broad university disclaimers that contemplated such a switch in learning format.  *See, e.g.*,
*Michel v. Yale Univ.*, 547 F. Supp. 3d 179, 190 (D. Conn. 2021) (dismissing complaint because
"[p]lainly, the Suspension Provision explicitly reserves [the university defendant's] right to
temporarily suspend—at its 'discretion and judgment'—its operations in response to
emergencies"); *Chong v. Northeastern Univ.*, No. 20-CV-10844, 2021 WL 1857341, at *5 (D.
Mass. May 10, 2021) (granting summary judgment in parallel claims where the university
defendant "unequivocally reserve[d] the right of the University to 'make changes of any nature
in its programs . . . and academic schedule' – 'including, without limitation, changes in course
content and class schedule, the cancellation of scheduled classes and other academic activities,
and the substitution of alternatives for scheduled classes and other academic activities' –
'whenever necessary or desirable.'"); *Smith v. Univ. of Pennsylvania*, 534 F. Supp. 3d 463, 474
(E.D. Pa. Apr. 20, 2021) ("[The defendant university] retained [through its 'Suspension of
Normal Operations' provision] the right to modify and cancel classes if the circumstances called
for it, further underscoring the lack of a guarantee of in-person instruction."); *Crista v. Drew
Univ.*, 534 F. Supp. 3d 363, 378 (D.N.J. Apr. 14, 2021) ("If, viewed in contractual terms, the
[plaintiffs] paid the [defendant] University tuition in exchange for an education which the
[defendant] University expressly provided that it could modify, then the [plaintiffs] have no
claim of breach based on the University's having provided such a modified education."),
*reconsideration denied sub nom. Dougherty v. Univ.*, 2021 WL 2310094 (D.N.J. June 7, 2021);
*Burt v. Bd. of Trs. of Univ. of Rhode Island*, 523 F. Supp. 3d 214, 222  (D.R.I. 2021) (dismissing
a class action for a tuition refund because, even if statements in the university's catalog "could
be interpreted as contractual promises" to supply in-person instruction, "all four universities
explicitly reserved the right to unilaterally alter the administration of their academic offerings");
*Lindner v. Occidental Coll.*, No. 20-CV-8481, 2020 WL 7350212, at *8 (C.D. Cal. Dec. 11,
2020) (dismissing analogous breach of contract claims against a college that switched to on-line
classes where the defendant university catalog specifically stated that "[f]ees, tuition, programs,
courses, course content, instructors, and regulations are subject to change without notice"),
*appeal dismissed*, No. 20-56424, 2021 WL 6196969 (9th Cir. July 8, 2021).

[9] Defendant also argues that Plaintiffs' breach of contract claim must be dismissed as
having failed to identify cognizable damages, as a result of impossibility of performance, and/or
due to the doctrine of acceptance.  (Def.'s Mem. 17–21.)  Because the Court rules on Defendant's

### 2.  Unjust Enrichment

Defendant argues that Plaintiffs' claim for unjust enrichment is duplicative of their claims for breach of contract and must be dismissed.  (*See* Def.'s Mem. 21–22).  Defendant alternatively argues Plaintiffs' claim for unjust enrichment also fails because they cannot sufficiently plead the elements of such a claim, namely a lack of enrichment or tortious conduct.  (*Id.* at 23.) Plaintiffs forward two rebuttals: (1) that the existence of an *implied* contract is irrelevant because if the contract claim fails, then the unjust enrichment claim would still allow recovery, and (2) that Defendant's argument presumes a requirement—that Plaintiffs had to plead or prove Defendant acted "in bad faith in exercising its discretion to suspend in-person learning amidst an unprecedented global pandemic"—that is not actually required.  (*See* Pls.' Mem. 23–24.)  The Court reviews the Parties' arguments to the extent needed.

### a.  Applicable Law

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004); *see also Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (holding that, under New York law, a claim for unjust enrichment demands that a plaintiff allege "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution." (internal quotation marks omitted)). Unjust enrichment typically "lies as a quasi-contract claim" that "contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the

primary arguments related to contractual promise and damages, the Court need not—and does not—opine on these arguments.

parties." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (quotation and citation omitted).  Accordingly, unjust enrichment claims are available "*only* in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff," such as when "the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (emphasis added) (citations omitted).  When analyzing unjust enrichment claims, New York courts generally consider "whether the defendant's conduct was tortious or fraudulent." *Clark v. Daby*, 751 N.Y.S.2d 622, 624 (App. Div. 2002) (quoting *Paramount Film Distrib. Corp. v. State*, 285 N.E.2d 695, 698 (N.Y. 1972)).

Importantly, "[u]nder New York law, a plaintiff may not recover under quasi-contract claims such as unjust enrichment where an enforceable contract governs the same subject matter." *Goldberg*, 535 F. Supp. 3d at 198 (citations omitted); *see also Zagoria v. New York Univ.*, No. 20-CV-3610, 2021 WL 1026511, at *13 (S.D.N.Y. Mar. 17, 2021) ("New York law does not permit recovery on a quasi-contract claim such as unjust enrichment if the parties have a valid, enforceable contract that governs the same subject matter as the quasi-contract claim" (citing *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 175 (2d Cir. 2005))).  Nor is an unjust enrichment claim available "where it simply duplicates, or replaces, a conventional contract or tort claim." *Columbia*, 523 F. Supp. 3d at 430 (quoting *Corsello*, 967 N.E.2d at 1185); *see also Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 430–31 (S.D.N.Y. 2020) (gathering authorities for the proposition that "where the validity of a contract that governs the subject matter at issue is not in dispute, and the claimant alleges

breach of the contract, the claimant cannot plead unjust enrichment in the alternative under New York law").

### b.  Application

As the *Columbia* court observed, "the New York Court of Appeals has made clear that 'unjust enrichment is not a catchall cause of action to be used when others fail.'"  523 F. Supp. 3d at 430 (quoting *Corsello*, 967 N.E.2d at 1185).  "[C]ourts in this District have previously dismissed unjust enrichment claims that were indistinguishable from contract claim pleaded in the alternative in the same complaint, at least where the parties did not dispute that they shared a contractual relationship."  *Id.* (collecting cases).  For this reason, courts in the Second Circuit— including in this district—have repeatedly dismissed unjust enrichment claims in analogous actions, namely where students brought both breach of contract and parallel unjust enrichment claims as a result of a university's decision to move to remote learning following the onset of the Covid-19 pandemic.  *See Amable II*, 2022 WL 1443352, at *11 (dismissing the plaintiffs' unjust enrichment claims as "duplicative of [the] [p]laintiffs' breach of contract cause of action" (quotation marks omitted)); *Brittain*, 2021 WL 3539664, at *29–31 (dismissing unjust enrichment claims because they "rest[ed] on the same factual allegations as their contract claims" (quoting *Columbia*, 523 F. Supp. 3d at 430)); *Fedele*, 2021 WL 3540432, at *7–8 (dismissing unjust enrichment claims because there was no dispute an implied contract governed the relationship between the parties and the plaintiff's unjust enrichment claim was based on the same conduct giving rise to the alleged breach of conduct claim); *Columbia*, 523 F. Supp. 3d at 430 (same); *Amable I*, 551 F. Supp. 3d at 318 (dismissing the plaintiffs' unjust enrichment claims due to lack of dispute over existence of an implied contract and because the claim was "indistinguishable from [their] contract claim" (alteration in original)); *Goldberg*, 535 F. Supp.

3d at 199 (dismissing unjust enrichment claims because of the existence of an implied contract exists between the parties prohibits unjust enrichment claims based on the same alleged conduct).

This Court, once again, adds harmony to this chorus. Plaintiffs' claim for unjust enrichment is based on the same set of facts and seeks to recover the "value of enrichment" based on the same tuition and fees as the claims for breach of contract. (*Compare* Compl. ¶¶ 56–67, *with id.* ¶¶ 68–72.) Moreover, the Parties do not dispute an implied contractual agreement exists between them. (*See* Def.'s Mem. 22; Pls.' Mem. 24.) With these two facts alone, the Court is persuaded that the relationship between the Parties is contractual in nature, meaning any unjust enrichment claim is precluded as duplicative. *See Goldberg*, 535 F. Supp. 3d at 198–199 (dismissing plaintiffs unjust enrichment claims because an implied contractual agreement between the parties and identical claims to cover the same tuition and fees based on the same allegedly breaching conduct). Defendant's Motion regarding this claim is therefore granted, and Plaintiffs' unjust enrichment claim is dismissed.[10]

---

[10] Additionally, the Court notes that Plaintiffs' claims for unjust enrichment would also fail with respect to additional elements Plaintiffs fail to plead. To assess these additional elements, courts generally consider, inter alia, "whether the defendant's conduct was tortious or fraudulent." *Clark*, 751 N.Y.S.2d at 624 (citation and quotation marks omitted). "Because Plaintiffs failed to allege any facts that 'rise to the level of tortious or fraudulent conduct sufficient to support an unjust enrichment claim,'" Plaintiffs' unjust enrichment claim suffers a second infirmity beyond repetition. *Amable II*, 2022 WL 1443352, at *11 n.8 (quoting *Hassan v. Fordham Univ.*, 533 F. Supp. 3d 164, 169 (S.D.N.Y. 2021)).

### III.  Conclusion

For the reasons stated above, Defendant's Motion is granted.  Because this is the first adjudication of Plaintiffs' claims on the merits, the Complaint is dismissed without prejudice. To the extent Plaintiffs have a good faith basis for filing an amended complaint, they must do so within 30 days of the date of this Opinion & Order.  Failure to properly and timely amend will result in dismissal of the Complaint with prejudice.  The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 27).

SO ORDERED.

Dated:    August 30, 2022
          White Plains, New York

                                      KENNETH M. KARAS
                           United States District Judge